MASSACHUSETTS BONDING AND INSURANCE COMPANY &
others *vs.* COMMISSIONER OF INSURANCE
(and a companion case [1]).

Suffolk.  April 8, 9, 1952. — September 11, 1952.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, & WILLIAMS, JJ.

*Insurance,* Classification of risks and establishment of premium charges,
Motor vehicle liability insurance, Commissioner of insurance.  *Equity
Jurisdiction,* Review of action of commissioner of insurance.  *Juris-
diction,* Justiciable question, Rate fixing.  *Constitutional Law,* Separa-
tion of powers of government.  *Witness,* Subpoena.  *Words,* "Ade-
quate, just, [and] reasonable," "Other persons authorized to examine
witnesses."

The provision of G. L. (Ter. Ed.) c. 175, § 113B, as amended, requiring
the commissioner of insurance to fix "adequate, just, [and] reasonable"
premium rates for compulsory motor vehicle liability insurance im-
poses on him the duty of fixing rates somewhere above the line of
confiscation and below the line of excessive or extortionate rates.  [270]
In a proceeding in equity under G. L. (Ter. Ed.) c. 175, § 113B, as
amended, by an insurance company for review of an order by the
commissioner of insurance fixing premium rates for compulsory motor
vehicle liability insurance, the scope of judicial review is not confined
to the constitutional question whether such rates are confiscatory.
[271–272]
The constitutional principle of separation of powers in art. 30 of the
Declaration of Rights is not contravened by a statute providing for
judicial review of the law and the facts in rate cases wherein con-
stitutional rights are not in issue, for the purpose of determining
whether the statutory duty imposed on the rate making body has
been satisfied.  [272]
In a proceeding in equity under G. L. (Ter. Ed.) c. 175, § 113B, as
amended, for review of an order by the commissioner of insurance
fixing premium rates for compulsory motor vehicle liability insurance,
where constitutional rights are not involved and the issue before the
court is compliance by the commissioner with the statutory duty im-
posed on him, the court is not authorized to enter the field of rate
fixing by substituting its judgment for his respecting rates but should
determine whether or not his order has reasonable support in the evi-
dence.  [273]
An order by the commissioner of insurance under G. L. (Ter. Ed.) c. 175,
§ 113B, as amended, fixing compulsory motor vehicle liability insur-

---

[1] The companion case is by Harold W. Canavan against the same re-
spondent.

ance premium rates for 1952 by use of the average loss level of 1948, 1949, and 1950, the last three years for which complete statistics were available, could not be said to be without reasonable support in the evidence despite an abrupt and substantial rise in the loss level in 1950, continued in 1951, and despite impressive evidence to the effect that a major trend was indicated making the loss levels of 1948 and 1949 irrelevant and requiring selection of the 1950 loss level alone. [273–277]

A justice of the peace has no authority under G. L. (Ter. Ed.) c. 233, § 1, as appearing in St. 1945, c. 250, § 2, to issue a subpoena summoning a witness to appear at a hearing before the commissioner of insurance. [278]

The commissioner of insurance has no power himself to compel obedience to a subpoena summoning a witness to appear at a hearing before him. [279]

Evidence showed that the commissioner of insurance, in fixing premium rates for compulsory motor vehicle liability insurance under G. L. (Ter. Ed.) c. 175, § 113B, as amended, was fully justified in allowing a certain percentage of the gross premium for expenses and profits and in making that allowance uniform throughout the rating territories. [279]

Two PETITIONS, filed in the Supreme Judicial Court for the county of Suffolk on January 7, 1952, and January 8, 1952.

The cases were reserved and reported by *Spalding,* J., without decision.

*R. Ammi Cutter,* (*James W. Perkins* with him,) for Massachusetts Bonding and Insurance Company and others.

*Vincent A. Canavan,* for Canavan.

*James W. Kelleher,* Special Assistant Attorney General, for the commissioner of insurance.

SPALDING, J. These are two petitions under G. L. (Ter. Ed.) c. 175, § 113B, as amended, for review of an order of the respondent commissioner of insurance (hereinafter called the commissioner), fixing premium charges for compulsory motor vehicle liability policies issued in the year 1952. The petitioners in what will be referred to hereinafter as the first case are fifty stock companies and thirteen mutual companies authorized to issue such policies under G. L. (Ter. Ed.) c. 90, §§ 34A–34J, as amended, and c. 175. The petitioner in the second case is an automobile owner who holds a compulsory insurance policy. A single justice of this court reported

and reserved the cases, without decision, on the pleadings, an amended stipulation, the exhibits introduced before the commissioner, the commissioner's order, and the transcript of oral testimony introduced before the commissioner at a public hearing, "such decrees to be entered as equity and justice may require," in accordance with the provisions of G. L. (Ter. Ed.) c. 175, § 113B, as amended.[1]

## The First Case.

The allegations of this petition challenge the propriety of the commissioner's selection of a loss level in fixing the premium charges for 1952. For a proper understanding of these allegations, a few facts concerning the rate method employed by the commissioner will be helpful. A part of each rate is designed to raise an amount sufficient to cover the losses likely to be incurred during the year. That portion is called the "pure premium" or loss cost per vehicle for the year. The practice under the compulsory insurance law has been to use the loss experience of the past as a guide to the probable losses and pure premiums of the succeeding year. The principal problem of the commissioner, therefore, is to select a comparable period in the past, adjusted, if necessary, to reflect the conditions likely to exist in the year for which the rates will be applicable.

The petitioners allege that they reported to the commissioner and to his statistical agent, the Massachusetts Automobile Rating and Accident Prevention Bureau (hereinafter called the Bureau), all the data, statistics, and information necessary to enable him to establish "adequate, just, reasonable and non-discriminatory premium charges" as required by § 113B; that on December 7, 1951, the commissioner, after due notice, held a public hearing on a schedule of tentative premium rates for 1952; that all the data and statistics previously submitted to the commissioner and the Bureau were introduced in evidence together with the testi-

---

[1] The petitioners in the first case were allowed to intervene in the second case, and the petitioner in the second case was allowed to intervene in the first.

mony of three experts called by the petitioners; that no evidence was introduced in behalf of the commissioner to challenge either the matters set forth in the exhibits or the testimony of the witnesses; that on December 19, 1951, the commissioner filed an order fixing the compulsory motor vehicle insurance premium charges for 1952 at the same level as the tentative rates; and that in setting these rates, the commissioner based the pure premium on the average pure premium[1] of the years 1948, 1949, and 1950, the last three years for which complete statistics were available.

The petitioners further aver that there was no evidence to warrant the commissioner's use of the average loss level of the years 1948, 1949, and 1950 in predicting the probable experience of 1952; that he disregarded the overwhelming and undisputed evidence that the sudden rapid rise of pure premiums in 1950 and the continuing upward trend in 1951 made the loss experience of 1948 and 1949 wholly unreliable as a guide to the probable losses of 1952; that this upward trend was such that the commissioner was required to base the pure premium for 1952 on the more pertinent data of the year 1950 alone; and that by reason of the commissioner's unwarranted use of the three year average, the premium rates for 1952 are substantially lower than would have resulted from the use of the loss experience of 1950 and are not "adequate, just, [and] reasonable," within the meaning of those words in § 113B. Other allegations are that the rates set by the commissioner will bring about an underwriting loss of over $600,000 for all companies as a whole, and an underwriting loss of over $1,500,000 for the stock insurance companies as a group (if certain assumptions are made as to conditions in 1952)[2]; and that in 1950 the latter companies wrote about 64.2% of all compulsory insurance.

In his answer, which included a demurrer, the commis-

[1] The controversy in the first case relates to the pure premium, for the petitioners concede that the commissioner's allowance of 36.5% of the gross premium for expenses and profit was reasonable.

[2] On a different set of assumptions, the underwriting losses will be over $1,700,000 and $2,200,000, respectively.

sioner's position is that the determination of a pure premium for 1952 was a matter of judgment as well as of mathematical analysis; that the use of the experience of 1950 alone would give disproportionate weight to loss estimates; and that his use of the data for the years 1948, 1949, 1950 was justified in that it contained a higher percentage of actual losses as distinct from estimated losses.

### The Demurrer.

The basis of the demurrer, in essence, is that judicial review under G. L. (Ter. Ed.) c. 175, § 113B, is confined to the question whether the premium rates fixed by the commissioner are confiscatory, and that there is no basis for such review inasmuch as the petitioners have failed to allege that the rates are so unreasonably low as to deprive any one of them of its property without due process of law.

We are of opinion that the demurrer must be overruled.

The pertinent provisions of § 113B are: "The commissioner shall, . . . after due hearing and investigation, fix and establish fair and reasonable classifications of risks and adequate, just, reasonable and non-discriminatory premium charges to be used and charged by companies in connection with the issue or execution of motor vehicle liability policies or bonds . . .. He shall . . . sign memoranda of the classifications and premium charges fixed and established by him . . . and file the same in his office, and cause a duly certified copy of such classifications and schedule of premium charges forthwith to be transmitted to each company authorized to issue such policies or to execute such bonds. . . . [T]he classifications and premium charges fixed and established by the commissioner . . . shall be used by all companies . . .. Any person or company aggrieved by any action, order, finding or decision of the commissioner under this section may . . . file a petition in the supreme judicial court for the county of Suffolk for a review of such action, order, finding or decision. . . . The court shall have jurisdiction in equity to modify, amend, annul, reverse or

affirm such action, order, finding or decision, shall review all questions of fact and of law involved therein and may make any appropriate order or decree."

It is apparent that this section fixes limits to the commissioner's authority by prescribing the establishment of "adequate, just, [and] reasonable" premium charges. In the exercise of this statutory authority, the commissioner's action is subject to constitutional restrictions against deprivation of property without due process of law. In other words the rates established must not be confiscatory. *Opinion of the Justices,* 251 Mass. 569, 610–611. *Lowell Gas Co.* v. *Department of Public Utilities,* 324 Mass. 80, 86–88. *Opinion of the Justices,* 328 Mass. 679. But the words "adequate, just, [and] reasonable" do not require the commissioner to fix rates so low as to barely withstand attack on constitutional grounds. "The mere fact that a rate is non-confiscatory does not indicate that it must be deemed to be just and reasonable. It is well known that rates substantially higher than the line between validity and unconstitutionality properly may be deemed to be just and reasonable, and not excessive or extortionate." *Banton* v. *Belt Line Railway,* 268 U. S. 413, 423. *Denver Union Stock Yard Co.* v. *United States,* 304 U. S. 470, 483, and cases cited. See *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,* 327 Mass. 81, 96. We are of opinion that the statute imposes upon the commissioner the duty of fixing a rate that lies somewhere between the lowest rate that is not confiscatory and the highest rate that is not excessive or extortionate.

The commissioner argues that the history of § 113B shows that the provision for judicial review inserted in that section was solely for the purpose of protecting the constitutional rights of parties affected by his action, and that administrative action within the limits of constitutional authority is not subject to judicial scrutiny. In support of this contention he directs our attention to *Opinion of the Justices,* 251 Mass. 569, where the justices considered the constitutionality of the proposed provisions of § 113B

which made final all decisions of the commissioner of insurance in approving premium charges. At pages 610–611 it was said: "A fundamental principle of rate making by public authority is that in general the rate so established must be sufficient to yield a fair return on the reasonable value of the property used or invested for doing the business after paying costs and carrying charges. Rates not sufficient to yield such return are unjust, unreasonable and confiscatory. That is the general rule. The making of rates may be treated as a legislative or executive function. 'In all such cases, if the owner claims confiscation of his property will result, the State must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, Fourteenth Amendment.' *Ohio Valley Water Co.* v. *Ben Avon Borough*, 253 U. S. 287, 289. That statement is equally interpretative of arts. 1, 10, and 11 of the Declaration of Rights of the Constitution of this Commonwealth. . . . Whenever heretofore the General Court has made provision for the fixing of rates by public authority, there has always been, so far as we are aware, express provision for such review by the courts as to satisfy constitutional requirements. See G. L. c. 25, § 5; c. 152, §§ 13, 11. . . . [T]here must be some provision for judicial examination of rates when fixed by public authority. . . . The answer to the sixth question . . . is that the provisions there enumerated will be constitutional if provision is made for a judicial review of the premiums there to be established by the commissioner of insurance, and not otherwise." While this opinion sets forth the constitutional prerequisites of judicial review in the field of rate making, it obviously does not purport to construe the actual provision for judicial review that was subsequently enacted. The point of the matter, without unnecessary elaboration, is that the General Court has conferred upon this court power to review "*any* action, order, finding or decision of the commissioner under this

section" (emphasis supplied). This broad grant of jurisdiction is not limited to questions in which only constitutional rights are involved. While a judicial review both as to law and facts is required in rate cases where the issue is one of confiscation it does not follow, as the commissioner contends, that it is beyond the power of the Legislature to furnish such a review in cases where other than constitutional questions are presented. Reviews of the latter type are not unknown. *Interstate Commerce Commission* v. *Union Pacific Railroad,* 222 U. S. 541, 547. *New York, Chicago & St. Louis Railroad* v. *Public Service Commission of Indiana,* 209 Ind. 466. *Anchor Coal Co.* v. *Public Service Commission,* 123 W. Va. 439, 449. Brown, The Functions of Courts and Commissions in Public Utility Rate Regulation, 38 Harv. L. Rev. 141, 157–158. True, as has often been said, the fixing of rates is a legislative rather than a judicial function. But it does not contravene the principle of separation of powers for the Legislature to provide a review in rate cases where confiscation is not the issue. And, although the scope of review is doubtless narrower in nonconstitutional cases there still may be a judicial review for the purpose of determining whether the statutory obligation imposed on the rate making body has been satisfied.

Our conclusion, therefore, is that it is not incumbent upon the petitioners to allege that the premium charges will be confiscatory as to any company in order to obtain judicial review of the commissioner's order. Each company is "aggrieved" within the meaning of § 113B by alleging that a lower schedule of premium charges has resulted from the commissioner's failure to establish them in accordance with the standards prescribed by the statute. See *Brest* v. *Commissioner of Insurance,* 270 Mass. 7, 19. Since, as we hold, the petitioners are entitled to a review without alleging confiscation it is unnecessary to discuss the argument of the commissioner based on *Aetna Ins. Co.* v. *Hyde,* 275 U. S. 440. That principle is not applicable here. Compare *Jordan* v. *American Eagle Fire Ins. Co.* 169 Fed. (2d) 281 (C. A. D. C.).

## Scope of Review.

The conclusion just stated does not lead us into the forbidden area of rate making. This court is given jurisdiction in equity to modify, amend, annul, reverse or affirm any decision or order of the commissioner and to review all questions of law and fact involved therein. G. L. (Ter. Ed.) c. 175, § 113B. In determining whether the commissioner has complied with the standards prescribed by the statute, we are not thereby authorized to substitute our judgment as to the reasonableness or adequacy of the premium charges for that of the commissioner. Whatever the scope of review may be in a rate case where constitutional rights are involved (see *Opinion of the Justices*, 328 Mass. 679), our present inquiry, as we said in construing a similar statute (G. L. [Ter. Ed.] c. 174A, § 18 [c], inserted by St. 1947, c. 614, § 1), "embraces questions of law, and, on the factual side, a reëxamination of the proceedings already concluded before the commissioner in order to determine whether his findings had reasonable support in the evidence." *Insurance Co. of North America* v. *Commissioner of Insurance*, 327 Mass. 745, 753.

## The Merits.

As stated above, in predicting future losses and pure premiums, it is customary to consider the loss experience of past periods which are indicative of expected future conditions. It is agreed that the commissioner set the losses in the premium charges for 1952 at the average loss level of the years 1948, 1949, and 1950. The question presented for decision is whether there was warrant in the evidence for his selection of that three year average as the basis for a forecast of the probable loss experience of 1952.

A summary of the tabulations of the basic loss data introduced in evidence before the commissioner to guide his

estimate of the pure premium for 1952 is set forth in the margin. [1]

The incurred losses reported by all companies for each policy year listed in the margin include both claims actually paid and reserves for outstanding claims. To compensate for any over or understatement of reserves, these incurred losses are modified by so called development factors which estimate, in the light of past experience, the ultimate amount of losses for each policy year when all outstanding claims have been settled. It is unnecessary to describe in detail the method employed in computing these factors. In brief, the incurred loss experience of ten policy years is analyzed to ascertain the accuracy of past loss estimates. As adjustments are made each year in the original incurred losses, the progress in the settlement of outstanding claims can be measured. On the basis of these comparisons, factors are actuarially determined to reflect the probable ultimate settlement of the incurred losses of any year.

[1] *Private Passenger Automobiles.*

| Policy Year. | Earned Car Years. | Losses Incurred (Developed). | Number of Claims. | Claim Frequency (per 100 Car Years). | Average Claim Cost (Developed). | Pure Premium. | |
|---|---|---|---|---|---|---|---|
| | | | | | | Actual (Developed). | Index 1946 = 100). |
| 1946 | 687,026.5 | $13,033,289 | 39,953 | 5.8 | $326 | $18.97 | 100 |
| 1947 | 744,565.7 | 14,291,714 | 43,596 | 5.9 | 328 | 19.19 | 101.2 |
| 1948 | 801,696.6 | 15,502,246 | 46,854 | 5.8 | 331 | 19.34 | 102.0 |
| 1949 | 860,069.5 | 18,288,848 | 52,630 | 6.1 | 347 | 21.26 | 112.1 |
| 1950 | 946,873.8 | 22,797,728 | 64,586 | 6.8 | 353 | 24.08 | 126.9 |
| 1948–50 | 2,608,639.9 | 56,588,822 | 164,070 | 6.3 | 345 | 21.69 | 114.3 |

*Commercial Motor Vehicles.*

| 1946 | 91,730.4 | $2,521,907 | 7,912 | 8.6 | $319 | $27.49 | 100 |
|---|---|---|---|---|---|---|---|
| 1947 | 101,619.4 | 2,840,512 | 8,000 | 7.9 | 355 | 27.95 | 101.6 |
| 1948 | 110,213.9 | 3,191,050 | 9,631 | 8.7 | 331 | 28.95 | 105.3 |
| 1949 | 112,711.0 | 3,215,059 | 8,835 | 7.8 | 364 | 28.52 | 103.7 |
| 1950 | 118,257.4 | 4,210,458 | 11,215 | 9.5 | 375 | 35.60 | 129.5 |
| 1948–50 | 341,182.3 | 10,616,567 | 29,681 | 8.7 | 358 | 31.12 | 113.2 |

Massachusetts Bonding & Ins. Co. *v.* Commissioner of Insurance.

Also in evidence were incomplete statistics of the loss experience of the year 1951 which disclosed the following trend:

|  | 1951 Index (1950 = 100) |
|---|---|
| (1) Claim frequency: |  |
|     (a) Passenger (first 9 months of each year) . . | 104.9 |
|     (b) Commercial (first 6 months of each year) . | 109.1 |
| (2) Average amount paid on claims — all classes . '. | 105.0 |
| (3) Combined effect: |  |
|     (a) Passenger . . . . . . . . | 110.1 |
|     (b) Commercial . . . . . . . . | 114.6 |

The petitioners' position is that there is nothing in this statistical material to support the commissioner's projection of the average loss level of 1948, 1949, and 1950 to 1952. They contend that in the light of the abrupt deterioration of loss conditions in 1950 and its continuance in 1951, the experience of 1948 and 1949 cannot reasonably be regarded representative of 1952 losses. This recent trend, they submit, required the commissioner to select the loss level of 1950 as the basis for predicting the pure premium of 1952. It is agreed that the average rates fixed by the commissioner for 1952 exceed the 1951 rates by 9.5% and 12.7% respectively for private passenger cars and commercial vehicles; and that if the commissioner had fixed the 1952 rates on the basis of the loss data of 1950 the increase would have been 21% in the case of private passenger cars and 30% in the case of commercial vehicles.

The expert testimony touching the selection of a loss level for 1952 in substance was as follows: In periods of relatively stable loss experience, the average loss level of two to three past years is a reliable guide to probable conditions in the future. Thus, in view of the minor fluctuations in pure premiums in the years 1946, 1947, and 1948, a rate maker could base his forecast of future losses on the average experience of those years. In periods of major changes in loss conditions, however, a "moving average" must give way to more recent and pertinent data. For example, the predecessor of the present commissioner took into account the basic change in hazard brought about by gasoline rationing by adjusting the pure premium of 1943 to the level

indicated by the loss experience of four months in 1942. The sharp rise in average claim costs and claim frequencies in 1950 indicates that a major deterioration in loss conditions is taking place. The trend continued with greater intensity in 1951 and is part of a general nationwide pattern. There are no indications that it will cease in the foreseeable future. In the light of these developments, it is said, the loss conditions of 1948 and 1949 seem certain not to recur. The loss experience of 1950 is the minimum level which has any relevance to the prediction of the pure premium of 1952.

The commissioner concedes that there has been an upward trend in the course of losses during the last five policy years. But he contends that he was not bound to limit his prediction to the results of 1950, inasmuch as the magnitude of the trend in that year is substantially affected by a high percentage of loss estimates. He argues that the average experience of 1948, 1949, and 1950 consists of a higher proportion of paid losses and affords a measure of the trend which is actuarially sounder and more responsive to probable conditions in 1952.

Concerning the statistical reliability of the so called development factors we may observe that the actuary of the insurance department testified that the developed losses of 1937–1941 proved to be accurate predictions; and that the chief examiner of the insurance department reported "that the development factors which have been used in the rate revision are reasonable and warranted." The evidence, oral and documentary, introduced by the petitioners is impressive and tends strongly to support their estimate of the probable conditions of 1952. It was not challenged by the commissioner or contradicted by any evidence introduced by him. If the commissioner had fixed the rates on the basis of the 1950 loss data it would be difficult to say that he was wrong. But the question is not what this court would decide if it were in the position of the commissioner. It "is elementary that the fixing of rates is not a proper judicial function." *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,*

327 Mass. 81, 85. *American Employers' Ins. Co.* v. *Commissioner of Insurance,* 298 Mass. 161, 169. This court "does not sit as a board of review to substitute its judgment for that of the Legislature or of the commission lawfully constituted by it, as to matters within the province of either." *Boston & Albany Railroad* v. *New York Central Railroad,* 256 Mass. 600, 618–619. As stated above, our inquiry here is whether the order of the commissioner was without reasonable support in the evidence. We cannot say that it was. Even though the loss estimates as adjusted by the development factors may be very reliable, their projection into the future is to some extent a matter of prophecy. By his projection of the average experience of 1948, 1949, and 1950 it is obvious that the commissioner gave some weight to the upward trend in losses discernible in 1949 and 1950. That he did not go farther and base his estimate solely on the 1950 data cannot be said to be unwarranted.

## THE SECOND CASE.

The petitioner Canavan, an individual automobile owner carrying compulsory automobile insurance, alleges that the commissioner erred in the following particulars: (a) in refusing to compel certain insurance companies to obey subpoenas which the petitioner had caused to be served upon them, thereby denying him a full hearing; (b) in arbitrarily fixing the expense and profit allowance and in failing to allocate these factors equitably among the rating territories; (c) in failing to make "any allowances to any territory for traffic hazards caused by special attractions" located therein; and (d) in failing to take into consideration and give credit for interest which the insurers have received on moneys reserved for payment of losses.

### (a) The Subpoenas.

The public hearing held by the commissioner took place on December 7, 1951. On December 4 and 5 the petitioner caused subpoenas to be served on eight of the companies

requiring them to produce at the hearing profit and loss statements and records of all "expenses charged to compulsory automobile insurance from January 1, 1946, to date; and more especially records of all cases on which the reserves were increased or the amount paid was higher than the original reserve from January 1, 1946, to date." The subpoenas were issued by Vincent Canavan, a justice of the peace. The purpose of these subpoenas, according to the allegations of the petition, was to enable the petitioner to substantiate his allegations to the effect that the rates were not properly established and to afford him a full hearing.

We are of opinion, as the commissioner and interveners argue, that the subpoenas were not lawfully issued and had no standing. The petitioner relies on G. L. (Ter. Ed.) c. 233, § 1, as appearing in St. 1945, c. 250, § 2, as authority for the subpoenas, but it is plain that that section has no application. The provisions of § 1 authorize justices of the peace and others to summon witnesses "in all cases pending before courts, magistrates, auditors, referees, arbitrators or other persons authorized to examine witnesses, and at all hearings upon applications for complaints wherein a person may be charged with the commission of a crime." The words "other persons authorized to examine witnesses" obviously do not apply to administrative hearings. If they did then § 8 of the same chapter which specifies the various administrative tribunals (not including the commissioner of insurance) before whom witnesses may be summoned would have been superfluous. Section 1 has to do with hearings of a judicial nature and the words "other persons authorized to examine witnesses" must be read in conjunction with the words which precede them, namely, "courts, magistrates, auditors, referees, arbitrators." Noscitur a sociis. *Assessors of Springfield* v. *Commissioner of Corporations & Taxation*, 321 Mass. 186, 193–194, and cases cited. This construction does not mean that authority is lacking to require the attendance of witnesses before the commissioner of insurance. By G. L. (Ter. Ed.) c. 175, § 8A, "At any hearing which the commissioner is authorized by law to

hold, he may by summons require the attendance and testimony of witnesses and the production of books, records and papers touching upon the matters in question at such hearing, and may administer oaths to such witnesses." See also G. L. (Ter. Ed.) c. 175, § 4, as amended.

There is therefore no merit in the petitioner's contention that the commissioner erred in failing to compel obedience to the subpoenas. Even if the subpoenas had been validly issued under G. L. (Ter. Ed.) c. 175, § 8A, the commissioner would not have had that power. The power to compel obedience to subpoenas "upon application of a tribunal authorized to summon but not to compel the attendance of witnesses and the giving of testimony before it" is vested in a justice of the Supreme Judicial or the Superior Court, and the exercise of that power is discretionary. G. L. (Ter. Ed.) c. 233, § 10. *Osborne, petitioner,* 141 Mass. 307. The commissioner was authorized to summon witnesses under G. L. (Ter. Ed.) c. 175, § 8A, but he had no power to compel obedience to his summons. See *Whitcomb's Case,* 120 Mass. 118.

### (b)   Expense Allowance.

In setting the rates the commissioner allowed 36.5% of the gross premium for expenses and profit. The petitioner contends that this allowance is arbitrary. He also contends that the allowance was improper in that it was the same for each territory and failed to take into account the expense record of the individual territory. The allowance cannot be said to be arbitrary. It appears that the commissioner had before him detailed information furnished by the insurance companies relating to their expenses. On the basis of this evidence, which need not be recited in detail, the commissioner was amply justified in arriving at the figure that he did. Nor is there any basis for holding that he erred in making the allowance uniform throughout all the territories. On the evidence he could have concluded that the differences in expenses among the territories were so slight that an allowance on a territorial basis was not called for.

(c)  Traffic Hazards Peculiar to the Territory.

It is not disputed that the pure premium established for a given territory is computed by charging back to that territory the losses caused by automobiles principally garaged therein, irrespective of where such losses occur.  This method of fixing premiums has been upheld by this court in *Brest* v. *Commissioner of Insurance*, 270 Mass. 7, and *Doherty* v. *Commissioner of Insurance*, 328 Mass. 161.

In his petition the petitioner alleges that the commissioner in fixing the rates "did not make any allowances to any territory for traffic hazards caused by special attractions" located in such territory.  In amplification of this allegation the petitioner in his brief states that the commissioner failed to take "into consideration special attractions or hazards in a city such as beaches, horse tracks, dog tracks or large shopping districts."  Thus, it is argued, a territory in which such attractions are located is subjected to increased traffic hazards brought about to a considerable extent by automobiles coming from other territories where the hazards and rates are less, thereby placing an unfair burden on the automobile owners who garage their automobiles in the more hazardous area.

The petitioner's contention does not go beyond a bald assertion.  No evidence was introduced before the commissioner tending to show what effect allowances for such peculiar hazards would have on the premiums or that it was either proper or feasible to make allowances on that basis. Nor does the petitioner suggest any method by which such allowances could be made.  He has the burden of establishing that the order of the commissioner is erroneous. See *Brest* v. *Commissioner of Insurance*, 270 Mass. 7, 12. On this record we cannot say that the commissioner erred in failing to make the allowances for which the petitioner contends.

(d)  Interest on Reserves.

Finally the petitioner urges that the commissioner erred in failing to take into consideration, in fixing the 1952

premiums, interest earned by the companies during the years 1946–1950 on moneys held by them as reserves for the payment of losses. Despite the allegations to the contrary in the commissioner's answer it would seem from the testimony at the hearing that interest on loss reserves was not considered in fixing the premiums and we shall deal with the case on that basis.

The evidence on this issue is very meager. The amount of interest earned on the reserves does not appear. Indeed it does not affirmatively appear that any interest was earned. If we assume that some interest was earned, we cannot, as the petitioner urges, infer that it was 3%. There is not enough in this record to show what effect the interest, if any, on reserves would have had on the 1952 premiums. We cannot say, therefore, that the petitioner has shown any error as to this aspect of his petition. Whether interest on reserves is a factor to be considered by the commissioner in fixing rates is a matter that need not be decided on this record. We might add that even if interest was earned in the amount suggested by the petitioner the net amount after taxes would not substantially affect the premium charges.

We perceive no grounds for annulling the order of the commissioner, and it is affirmed. G. L. (Ter. Ed.) c. 175, § 113B.

*So ordered.*